Michael Reynolds (CA#174534)
Brett W. Johnson (CA#205988)
Derek C. Flint (AZ#034392) (*pro hac vice application pending*)
SNELL & WILMER L.L.P.
600 Anton Boulevard, Suite 1400
Costa Mesa, California  92626-7689
Telephone: (714) 427-7000
Facsimile: (714) 427-7799
E-Mail:mreynolds@swlaw.com
            bwjohnson@swlaw.com
            dflint@swlaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENSE DISTRIBUTED, a Texas corporation; SECOND AMENDMENT FOUNDATION,<br><br>              Plaintiffs,<br>    v.<br>ROBERT BONTA, in his official capacity as California Attorney General; LUIS LOPEZ, in his official capacity as Director of the California Bureau of Firearms,<br><br>              Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Defense Distributed and Second Amendment Foundation ("SAF") ("Plaintiffs"), for their Complaint against California Attorney General Robert Bonta and Bureau of Firearms Director Luis Lopez (collectively, "Defendants"), allege as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Defense Distributed is a non-profit corporation organized under the laws of the State of Texas, with its headquarters and principal place of business in Austin, Texas. Defense Distributed sells products and software that allow consumers to self-manufacture some of the most popular firearms in the United States. Among other things Defense Distributed sells a product called the Ghost

Gunner. The Ghost Gunner is a general-purpose Computerized Numerical Code milling machine ("CNC machine") that gives purchasers the ability to complete unfinished frames and receivers for various types of firearms, including the AR-15, AR-308, M1911, and AK-47. The unfinished frames and receivers, and the code to complete them, are sold together with the CNC machine. Defense Distributed has standing to challenge Cal. Penal Code §§ 29180(f), 29185, 30400, 27530(a), and 18010(d) because they effectively prohibit Defense Distributed from selling or importing—and its customers from possessing or using—the Ghost Gunner, unfinished frames and receivers, and other precursor parts in California without risking criminal prosecution. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (supplier of firing-range facilities had standing to bring Second Amendment challenge to ordinance); *Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 61 (9th Cir. 1994) ("It is well settled that a provider of goods or services has standing to challenge government regulations that directly affect its customers and restrict its market."); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015–16 (9th Cir. 2000) (holding that a party has standing to challenge constitutionality of statute where "a credible threat of prosecution . . . is clearly traceable" to the challenged statute "and can be redressed through an injunction enjoining enforcement of that provision.").

2.    Plaintiff SAF is a non-profit educational foundation incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 650,000 members and supporters nationwide, including thousands of members in California. The Court's interpretation of the Second Amendment directly impacts SAF's members and supporters in California. SAF brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public. The laws, policies, practices, and customs challenged in this

case, and Defendants' actions and failures alleged herein, have caused SAF to dedicate resources—including for this action—that would otherwise be available for other purposes to protect the rights and property of its members, supporters, and the general public.

3.      Defendant Robert Bonta is the Attorney General of the State of California and is being sued in his official capacity. Under Article 5, § 13 of the California Constitution, Attorney General Bonta is the "chief law officer of the State," with a duty "to see that the laws of the state are uniformly and adequately enforced." Cal. Const. art. V, § 13. Defendant Bonta is the head of the California Department of Justice ("DOJ"). The DOJ and its Bureau of Firearms regulate and enforce state law related to the sales, transfer, possession, and ownership of firearms. As head of the DOJ, Defendant Bonta is responsible for the creation, implementation, execution, and administration of the laws, regulations, customs, practices, and policies of the DOJ. Further, under Section 10 of California Assembly Bill 1621 ("AB 1621"), the Attorney General is specifically permitted to "bring an action to enjoin the importation into the state or sale or transfer of any firearm precursor part that is unlawfully imported into this state or sold or transferred within this state." *See* Cal. Penal Code § 18010(d)(1). The Attorney General and DOJ maintain an office in Los Angeles, California.

4.      Defendant Luiz Lopez is the Director of the DOJ's Bureau of Firearms and is being sued in his official capacity. On information and belief, Defendant Lopez reports to Attorney General Bonta, and is responsible for the various operations of the Bureau of Firearms, including the implementation and enforcement of the statutes, regulations, and policies regarding weapons, including firearms and magazines. As head of the Bureau, Defendant Lopez is responsible for the creation, implementation, execution, and administration of the laws, regulations, customs, practices, and policies of the DOJ.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

5.      Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331, 1343, 2201–02 and 42 U.S.C. §§ 1983 and 1988, as this action seeks to redress the deprivation under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of California, of the rights, privileges, or immunities secured by the United States Constitution.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' causes of action arose or exist in this district in which the action is brought. Venue is also proper under 28 U.S.C. § 1391, as the venue rules of this State specifically permit this action to be filed in the Central District since the Attorney General and California Department of Justice maintain an office within this Division. Cal. Civ. Proc. Code § 401(1).

## FACTUAL ALLEGATIONS

### I.   CNC Milling Machines and the Ghost Gunner Product

7.      CNC milling machines are the modern-day manifestation of firearm milling technology, technology that has never before been regulated in American history.

8.      Firearm milling technology dates back to the early nineteenth century. *See, e.g.*, Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 92 Bus. Hist. Rev. 57, 64 (2018) (explaining that "Federal support of small arms manufacturing has been well documented," and that federal funds supported the development of the first firearm milling machine in the 1810s).

9.      The earliest known milling machine originated at a factory operated by Simeon North, who had a contract with the War Department to manufacture firearms. David A. Hounshell, *From the American System to Mass Production, 1800-1932* 28–29 (1984). Beginning in 1820, John H. Hall, a cooper, cabinetmaker, and boatbuilder, improved upon North's milling machine, "develop[ing] three classes of milling machines, which he used to finish [firearm] parts." *Id.* at 39–41.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

10.     Building on these innovations, John T. Parsons invented the first numerical control (NC) milling machine in the 1940s. Sohaib Jabran et al., *Functional Reverse Engineering of Strategic and Non-Strategic Machine Tools* 42 (Wasim Ahmed Khan et. al. eds., 1st ed. 2021).

11.     Modern-day CNC milling is a standard machining process that employs computerized controls and rotating cutting tools to precisely remove material from a workpiece to produce a custom-designed part or product.

12.     As in any manufacturing process that begins with the preparation of specifications, CNC milling begins with a design of the final component, which is used to generate coded instructions. It then removes material from the workpiece using a series of precise movements along different paths and axes to produce the final design shape.

13.     This process can be used with a variety of materials, including plastic, metal, wood, and glass. And it can create products for use in a wide range of industries, including aerospace, automotive, commercial, electronics, maintenance, medical, telecommunications, and transportation.

14.     CNC milling machines are also commonly used to manufacture a wide variety of firearm frames and receivers.

15.     The Ghost Gunner is the latest evolution of a general-purpose CNC milling machine that allows users to manufacture their own firearms by finishing incomplete frames and receivers of some of the most popular firearms in the United States, including the AR-15, AR-308, M1911, and AK-47.

16.     The AR-15, AR-308, M1911, and AK-47 are all commonly used firearms in the United States.

17.     Defense Distributed used to sell 80%-complete frames and receivers but due to the current regulations in place no longer does so in California. It continues to sell the Ghost Gunner in California.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

18.     Because the materials provided by Defense Distributed often do not have serial numbers and are not licensed with the federal government, they may be used to make what are popularly known by the moniker "ghost guns."

**II.     The Sparse History of Self-Manufactured Firearm Regulation.**

19.     Self-manufactured firearms have a long and, until recently, unregulated history in the United States. *See, e.g.*, Joseph G. S. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. (forthcoming 2022).[1]

20.     The unregulated self-manufacture of firearms was common in the American colonies, beginning with gunsmiths who made and repaired militia and hunting weapons and were "extremely important and highly valued in their communities." *See id.* at 9.

21.     Indeed, colonists had the express right to import firearms and the parts necessary to make them. *Id.* at 9–10 (citing Francis Newton Thorpe, *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America* 3787–88 (Francis Newton Thorpe ed., 1909)).

22.     While "[i]n the large gunsmith shops of the cities it is probable that many minds were given to the making of a gun . . . in the smaller shops which formed the great majority—mere cabins on the outskirts of the wilderness—one man with or without an apprentice did every part of the work." Charles Winthrop Sawyer, *Firearms in American History* 145 (1910); *see also* James B. Whisker, *The Gunsmith's Trade* 5 (1992) ("In small shops one tradesman performed all operations required to make a gun . . . There was no division of labor.").

---

[1] Manuscript available at:
https://deliverypdf.ssrn.com/delivery.php?ID=574084113083007008102120094005023080500820520060430550300971140060060031060890980000290450320550140580320160270750930650010280330700560890281161210260100200930770300630120640900890880980721240031200210070711261120271171220170770201140640000311110120133&EXT=pdf&INDEX=TRUE.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

23.     Colonial law reflected an understanding that the right to bear arms extended to commerce in firearms, which is necessarily associated with their manufacture. For instance, in Virginia, all persons had "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." Laws of Va., Feb. 1676–77, Va. Stat. at Large, 2 Hening 403 (1823).

24.     During the Revolutionary War, when the British attempted to prevent the Americans from acquiring firearms and ammunition, Americans manufactured their own arms and gunpowder to survive. *See* Greenlee, *supra*, at 12–15 (citing M.L. Brown, *Firearms in Colonial America: The Impact on History and Technology 1492-1792* 127 (1980)).

25.     Further, "[w]hen the colonies faced major arms shortages throughout the war, domestic arms manufacturing filled the void." *See* Greenlee, *supra*, at 16; *see also* David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 Harv. L. Rev. F. 230, 234 (2014) (explaining that "the right to engage in firearms commerce . . . is one of the most important reasons why America's political dispute with Great Britain turned into an armed revolution.")

26.     Several colonial representative bodies subsequently solicited firearm manufacturers, including those engaged in private manufacture and those outside of the firearms business, to increase domestic production. *See* Greenlee, *supra*, at 18–23.

27.     The circumstances of the war required "[n]early every able-bodied male between 16 and 60 . . . to provide his own arms in the colonial and founding eras," and some men "built their arms themselves." *Id.* at 25.

28.     After the Revolutionary War, "[b]ecause gunsmithing was a universal need in early America, many early Americans who were professionals in other occupations engaged in gunsmithing as an additional occupation or hobby." *See id.* at 29.

29.     Indeed, "persons occupied as blacksmiths, whitesmiths, tinsmiths, locksmiths, silversmiths, farmers, clock and watchmakers, carpenters, mechanics, cutlers, stonemasons, merchants, and at least one attorney offered gunsmithing services." *Id.* at 29–31. This tradition extended to pioneers, mountain men, and explorers whose need to make and repair firearms was a necessity to survive. *Id.* at 32.

30.     Although some early riflemakers forged their firearm parts from scratch, "there were gunsmiths who did not forge out their barrel blanks, but purchased them in bulk from some factory like that of Eliphalet Remington." John G.W. Dillin, *The Kentucky Rifle* 96 (1975). These riflemakers then fitted their barrels "to hand-made stocks with American factory or English locks." *Id.*

31.     Describing the landscape of firearms in early America in 1793, Thomas Jefferson wrote that "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States George Hammond, May 15, 1793, in *The Writings of Thomas Jefferson* 325–26 (Paul Ford ed., 1904) (vol. 7).

32.     It is also notable that in the nineteenth and twentieth centuries, "[m]any of the most important innovations in firearms technology began not in a federal armory or major firearms manufactory, but in private homes and workshops . . . [including] [t]he most popular rifle in America today . . . the AR-15, owned in the tens of millions . . . [whose] roots are in homebuilding. *See* Greenlee, *supra*, at 35–39.

33.     To be sure, anyone with the requisite skill could build firearms for any purpose; "[o]ne need not have had a wealthy patron or sponsor, or work for king and nobility, to make guns." *See id.* at 41 (internal citation removed); Whisker, *supra*, at 6 ("Even those apprentices who had never completed an apprenticeship might enter the trade. No guild, union or government agency attempted to regulate the gun

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

making business . . . He need not take any examination. He need not present one of his guns to any examining board."); *id.* at 90 ("Gunsmiths considered it to be their right to make guns without regulation or interference.").

34.     In fact, *no restrictions* were placed on the ability to manufacture arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. *See* Greenlee, *supra*, at 40. Rather, "*[a]ll such restrictions have been enacted within the last decade.*" *Id.* (emphasis added).

35.     Any such restriction is inconsistent with the Nation's historical tradition of firearms regulation.

36.     In addition, it may be safely said that the United States has no historical tradition of regulating the tools and parts used for the self-manufacture of firearms.

37.     Thus, laws that restrict the tools and parts used for the self-manufacture of firearms are inconsistent with the Nation's historical tradition of firearms regulation.

38.     The first major federal gun regulation was narrow, and not enacted until the 1934 National Firearms Act, which "regulated a subset of arms thought particularly suitable for criminal use." *See* Jake Charles, *Ghost Guns, History, and the Second Amendment*, Duke Center for Firearms Law (Apr. 27, 2022), https://firearmslaw.duke.edu/2022/04/ghost-guns-history-and-the-second-amendment/.

39.     The federal government has never required a license to build a firearm for personal use. *See* Greenlee, *supra*, at 42. Restrictions applying to self-manufactured firearms generally apply to all firearms—for instance, "the making of a firearm that falls within the scope of the National Firearms Act requires advanced approval by [ATF], as well as a tax payment. But no federal law uniquely targets arms built for personal use." *Id.* at 42–43.

40.     Despite these laws—all of which were enacted long after the Founding and the passage of the Fourteenth Amendment—it has always been lawful to build

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

arms for personal use under federal law with no special restrictions. *See What is ATF Doing in Regards to People Making Their Own Firearms*, Bureau of Alcohol, Tobacco, Firearms and Explosives (May 14, 2015), https://www.atf.gov/firearms/qa/what-atf-doing-regards-people-making-their-own-firearms (last visited August 4, 2022) ("An individual may generally make a firearm for personal use.").

41.    At the state level, it was not until 2016 that a small minority of states began to narrowly regulate the manufacture of arms for personal use. *See* Greenlee, *supra*, at 42. California was the first state to regulate self-built arms, passing a law in 2016 that took effect in 2018. *See* 2016 Cal. Legis. Serv. Ch. 60 (A.B. 857) (adding Cal. Penal Code § 29180). Thereafter, only a handful of other states (including New Jersey, Connecticut, Hawaii, the District of Colombia, Rhode Island, and Nevada) have implemented similar narrow regulations, but none have outright banned self-manufacturing processes for firearms.

## III.    California Imposes Unprecedented Restrictions on the Self-Manufacture of Firearms with the Passage of AB 1621 and Attempts to Deter the Vindication of Constitutional Rights with the Passage of SB 1327.

42.    On June 30, 2022, California Governor Gavin Newsom signed AB 1621, which amended or added multiple provisions of the Penal Code, including §§ 29180(f), 29185, 30400, 27530(a), and 18010(d). AB 1621 was enacted as an "urgency" statute, meaning that these provisions took effect immediately. *See* AB 1621 § 41.

43.    Section 29180(f), as added by AB 1621 § 22, provides that "[a] person, corporation, or firm shall not knowingly manufacture or assemble, or *knowingly cause, allow, facilitate, aid, or abet the manufacture or assembling of*, a firearm that is not imprinted with a valid state or federal serial number or mark of identification."

44.    A violation of Section 29180(f) "is punishable by imprisonment in a county jail not to exceed one year, or by a fine not to exceed one thousand dollars

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

($1,000), or by both that fine and imprisonment" if the firearm at issue is a handgun. Cal. Penal Code § 29180(g). For all other firearms, a violation of § 29180(f) "is punishable by imprisonment in a county jail not to exceed six months, or by a fine not to exceed one thousand ($1,000), or by both that fine and imprisonment." *Id.*

45.     Section 29185, as added by AB 1621 § 25, imposes sweeping restrictions that criminalize the use or sale of CNC milling machines. It provides, in relevant part, that:

(a) No person, firm, or corporation, other than a federally licensed firearms manufacturer or importer, shall use a computer numerical control (CNC) milling machine to manufacture a firearm, including a completed frame or receiver or a firearm precursor part[;]

(b) It is unlawful to sell, offer to sell, or transfer a CNC milling machine that has the sole or primary function of manufacturing firearms to any person in this state, other than a federally licensed firearms manufacturer or importer[; and]

(c) It is unlawful for any person in this state other than a federally licensed firearms manufacturer or importer to possess, purchase, or receive a CNC milling machine that has the sole or primary function of manufacturing firearms.

Cal. Penal Code § 29185(a)–(c).

46.     To avoid violating § 29185, any individual in California who possessed a CNC machine "that has the sole or primary function of manufacturing firearms" before the effective date of AB 1621 (June 30, 2022) must, within 90 days after the effective date, take one of the following actions:

(A) Sell[] or transfer[] the machine to a federally licensed firearms manufacturer or importer[;]

(B) Sell[] or transfer[] the machine to a person described in [§ 29185(d)] paragraph (1)[;]

(C) Remove[] the machine from this state[;]

(D) Relinquish[] the machine to a law enforcement agency[; or]

(E) Otherwise lawfully terminate[] possession of the machine.

Cal. Penal Code § 29185(d)(3)(A)–(E).

47.     Under § 29185(f), a violation of § 29185 "is punishable as a misdemeanor."

48.     Cal. Penal Code § 30400, as added by AB 1621 § 28, also criminalizes the sale or transfer of federally unregulated firearm precursor parts.

49.     Specifically, Cal. Penal Code § 30400(a) states, in relevant part, that "it shall be unlawful for a person to purchase, sell, offer to sell, or transfer ownership of any firearm precursor part in this state that is not a federally regulated firearm precursor part."

50.     Cal. Penal Code § 16519, as added by AB 1621 § 5, defines a "federally regulated firearm precursor part" as "any firearm precursor part deemed to be a firearm pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and any regulations issued pursuant thereto, and, if required, *has been imprinted with a serial number* by a federal licensee authorized to serialize firearms in compliance with all applicable federal laws and regulations." (emphasis added).

51.     The federal definition of a "firearm" under the Gun Control Act of 1968 includes "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3).

52.     Prior to April 22, 2022, ATF regulations defined "frames" and "receivers" as firearm components that are readily operational without any additional modification. *See* 27 C.F.R. §§ 478.11, 479.11 (as effective until August 24, 2022) (defining a "firearm frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel").

53.     However, on April 22, 2022, ATF issued a so-called "Final Rule" expanding the definition of a "frame" and "receiver," and in turn a "firearm," to include a "partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designated to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

- 12 -

receiver" *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652, 24735, 24739 (Apr. 26, 2022) (to be codified at 27 C.F.R. §§ 478.11 and 478.12) (the "New Rule").

54.    The New Rule took effect on August 24, 2022. *Id.* at 24652.

55.    Now that the New Rule is in effect, any precursor parts falling outside the current federal definition of "frame or receiver" (which are therefore not considered "firearms") are not federally regulated nor required to have a serial number, and thus do not qualify as "federally regulated precursor parts" under Cal. Penal Code § 16519.

56.    The California DOJ Bureau of Firearms has taken the position that, since the New Rule took effect, only federally regulated firearm precursor parts may be purchased, sold, offered for sale, or transferred in California, unless a limited exception applies. *See id.* § 30400(b).

57.    Additionally, Cal. Penal Code § 27530(a), as added by AB 1621 § 17, prohibits the sale or transfer of "a firearm that is not imprinted with a serial number imprinted by a federal licensee authorized to serialize firearms."

58.    Due to ATF's new and expansive definition of "firearm" in its New Rule, this regulation works in conjunction with § 30400 to effectively ban the sale, transfer, or import into California of all incomplete frames, receivers, and other precursor parts required to self-manufacture a firearm.

59.    To enforce these new restrictions on the sale, transfer, or import of firearm precursor parts, Cal. Penal Code § 18010(d)(1), as added by AB 1621 § 10, bestows enforcement power upon the Attorney General, a district attorney, or a city attorney to "enjoin the importation into the state or sale or transfer of any firearm precursor part that is unlawfully imported into [California] or sold or transferred within" California.

60.    Against the backdrop of sweeping restrictions on the self-manufacture and possession of firearms, California also enacted legislation that goes to

- 13 -

unprecedented lengths to deter affected parties from seeking to enforce their constitutional rights.

61.     Specifically, Section 2 of Senate Bill 1327 ("SB 1327"), which was enacted on July 22, 2022, adds the following provision to the California Civil Code:

> **1021.11** (a) Notwithstanding any other law, any person, including an entity, attorney, *or law firm*, who seeks declaratory or injunctive relief to prevent this state, a political subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or *any other type of law that regulates or restricts firearms*, or that represents any litigant seeking that relief, *is jointly and severally liable to pay the attorney's fees and costs of the prevailing party.*

(emphasis added).

62.     In other words, any person—including a lawyer or law firm representing a client—who seeks to enjoin a California firearm restriction faces the prospect of liability under SB 1327 for the California government's attorneys' fees.

63.     And the attorneys' fees provision in Section 2 of SB 1327 is arbitrarily one-sided in the *government's* favor, as it provides that "[a]ny person, including an entity, attorney, or law firm, who seeks declaratory or injunctive relief as described in subdivision (a), shall not be deemed a prevailing party under this section or any other provision of this chapter." SB 1327 § 2.

64.     The government is considered the "prevailing party" if a court does either of the following: (1) "[d]ismisses any claim or cause of action brought by the party seeking the declaratory or injunctive relief described by subdivision (a), regardless of the reason for the dismissal," or (2) [e]nters judgment in favor of the party opposing the declaratory or injunctive relief described by subdivision (a), on any claim or cause of action." *Id.*

65.     Thus, to avoid liability for the government's attorneys' fees, a plaintiff in a Second Amendment case must win in all respects, even if it substantially prevails

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

on the merits, settles a claim without a waiver, or voluntarily dismisses any portion of the action for any reason.

66.    Additionally, if the government is deemed the "prevailing party," it can seek to recoup fees for three years after the litigation concludes. *Id.*

67.    Worse yet, California's inclusion of Section 2—and its passage of SB 1327 more generally—was nothing more than an ill-advised political ploy designed to manufacture a proxy war with the State of Texas.

68.    The California Senate Judiciary Committee's analysis of SB 1327 admitted that the bill "is modeled after a controversial Texas abortion law, and includes a number of the same *problematic procedural mechanisms*." *See* California Senate Judiciary Committee Analysis of SB 1327, at 2 (2022) (emphasis added).

69.    The California Assembly Committee on Judiciary's analysis of SB 1327 further acknowledges that "Texas included a number of provisions in SB 8 *to discourage lawsuits challenging the law itself* . . . The mechanism for doing so was to make the party who was not the 'prevailing party' in such a lawsuit responsible for attorney's fees, imposed liability for the fees on both the plaintiff and their attorney, and create lopsided and unfair rules about who was the 'prevailing party' (spoiler alert: almost never the party who challenges the law). *This bill replicates those provisions*." *See* Assembly Judiciary Committee Analysis of SB 1327, at 12 (2022).

70.    The Assembly Judiciary Committee's analysis goes on to state, "[i]t's a lose-lose scenario for plaintiffs who challenge the bill or a gun law; and a win-win scenario for the government. An attorney could properly represent a client in seeking to strike down an unconstitutional law, win on all but one count, and break no other statutory or professional duties, but then be held responsible (along with their client) for paying the defendant's attorney's fees. In fact, even if the defendant failed to seek attorney's fees in the underlying action or the court refused to award them and found this bill to unconstitutional, this bill would allow the defendant government entity to

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

bring an action within three years to hold the attorney responsible for those fees and costs. *This language appears to be unprecedented in California law and likely would not be endorsed by this Committee but for the fact that it is included in this bill and modeled on Texas law*." *Id.* at 13 (emphasis added).

71.    Astonishingly, the Senate Floor analysis all but concedes that SB 1327 is unconstitutional, stating as follows: "While the goal of repurposing the Texas law may be sound, these problematic provisions may not justify those ends. They insulate government action from meaningful challenge by creating a strong, punitive deterrent for any that try and in the end, *may violate due process guarantees*." *See* Senate Floor Analysis of SB 1327, at 7 (2022) (emphasis added).

72.    Nevertheless, California Governor Gavin Newsom signed SB 1327 into law, confirming in his statement that the bill has no legitimate purpose: "If they [Texas] are going to use this framework to put women's lives at risk, we are going to use it to save people's lives here in the state of California. *That's the spirit, the principle, behind this law*." Alex Berke, *California's New Gun Bill Is Bad Law and Dumb Politics*, THE DAILY BEAST (July 29, 2022) (emphasis added), https://www.thedailybeast.com/californias-new-gun-bill-is-bad-law-and-dumb-politics.

**First Claim for Relief**
**(42 U.S.C. § 1983 Action for Deprivation of**
**Plaintiffs' Rights under U.S. Const. amends. II and XIV)**

73.    Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

74.    The Second Amendment, which applies against the States under U.S. Const. amend. XIV, guarantees "a law-abiding citizen's right to armed self-defense." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022).

75.    To justify a firearm regulation that is the subject of a Second Amendment challenge, the "government may not simply posit that the regulation promotes an important interest." *Id.* at 2126. "Rather, the government must

demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* A firearm regulation only falls outside the "Second Amendment's 'unqualified command'" if it is "consistent with this Nation's historical tradition." *Id.* at 2126, 2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). This analytical framework does not "invoke any means-end test such as intermediate scrutiny," *Id.* at 2128–29; such a standard is too deferential "to the determinations of legislatures." *Id.* at 2131.

76.     The historical analysis of the Second Amendment "requires courts to assess whether modern firearm regulations are consistent with the Second Amendment's text and historical understanding." *Id*. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*.

77.     Further, "the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees . . . [and] fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia,* 448 U.S. 555, 579–80 (1980).

78.     Here, the text of the Second Amendment, which guarantees "the right of the people to keep and bear Arms," implicitly includes the right to acquire and manufacture firearms. *See* U.S. Const. amend. II. Further, the "right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *See Andrews v. State*, 50 Tenn. 165, 178 (1871). Without constitutional protections for the acquisition and manufacturing of firearms, the "right of the people to keep and bear Arms" would be in jeopardy. *See Ezell*, 651 F.3d at 704 (clarifying that "[t]he right to possess firearms for protection implies a

- 17 -

corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930, 930 (N.D. Ill. 2014) (holding that "the right to keep and bear arms for self-defense under the Second Amendment . . . must also include the right to *acquire* a firearm . . .") (emphasis in original).

79.    Nothing in the "Nation's historical tradition of firearm regulation" supports the heavy-handed restrictions in Cal. Penal Code §§ 29180(f), 29185, 30400(a), 27530(a), and 18010(d). *See Bruen*, 142 S. Ct. at 2130. To the contrary, self-manufactured firearms were not subject to *any* governmental regulation—state or federal—until 2016.

80.    Nevertheless, Penal Code § 29185 prohibits *any* private person or company (except a "federally licensed firearms manufacturer or importer") from using modern technology—a CNC milling machine—to manufacture their own weapons. Even the mere sale, offer to sell, transfer, possession, purchase, or receipt of this technology subjects an individual to criminal liability. *See* Cal. Penal Code § 29185(b)–(c), (f). Section 29180(f) similarly prohibits any person or company from manufacturing or "caus[ing], allow[ing], facilitat[ing], or abet[ting] the manufacture of" firearms—a prohibition that appears to apply broadly to companies that sell CNC milling machines.

81.    Likewise, the regulatory scheme in §§ 30400, 27530(a), and 18010(d) undermines the right to self-manufacture firearms because it all but prohibits individuals from acquiring the precursor materials required to self-manufacture modern, commonly used firearms.

82.    These unprecedented regulations are plainly inconsistent with the "Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. Accordingly, the restrictions on the self-manufacture of firearms in §§ 29180(f), 29185, 30400, 27530(a), and 18010(d) fall directly within—and are proscribed by—

the Second Amendment's "unqualified command." *Id.* (quoting *Konigsberg*, 366 U.S. at 50 n.10).

83.    Because Cal. Penal Code §§ 29180(f), 29185, 30400, 27530(a), and 18010(d) violate Plaintiffs' and Plaintiffs' members' rights under the Second and Fourteenth Amendments to the United States Constitution, they are invalid—both facially and as applied against the Plaintiffs in this action. Plaintiffs are therefore entitled to declaratory and permanent and preliminary injunctive relief against Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them.

**Second Claim for Relief**
**(42 U.S.C. § 1983 Action for Deprivation of**
**Plaintiffs' Rights under U.S. Const. amends. I and XIV)**

84.    Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

85.    The First Amendment, which applies against the States under U.S. Const. amend. XIV, provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I.

86.    The right of access to the courts is one aspect of the right of petition, *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011). It "cannot be impaired, either directly . . . or indirectly, by threatening or harassing [an individual] in retaliation for filing lawsuits," and "state officials may not take retaliatory action against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future." *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1427–28 (8th Cir. 1986); *see also United States v. Jackson*, 390 U.S. 570, 582 (1968) ("Whatever might be said of Congress' objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights.")

87.    The fee-shifting provision in SB 1327 § 2, which imposes liability upon everyone who seeks to challenge California's litany of restrictions on their Second Amendment rights—including attorneys and law firms—is plainly intended to chill and punish challenges to gun-related legislation.

88.    Under the fee-shifting provision, an attorney could represent a client seeking to strike down an unconstitutional law, win on all but one claim, and still be held responsible for paying the government's attorney's fees.

89.    In fact, even if the defendant fails to seek attorney's fees in the underlying action or the court refuses to award them and *finds this provision unconstitutional*, this bill allows the defendant to bring an action within three years to hold the attorney responsible for those fees and costs.

90.    There is no question that this violates the First Amendment right to petition the government for a redress of grievances. *See In re Workers Comp. Refund*, 842 F. Supp. 1211, 1218–19 (D. Minn. 1994), *aff'd sub nom. In re Workers' Comp. Refund*, 46 F.3d 813 (8th Cir. 1995) (finding a similar fee-shifting provision unconstitutional because "[i]t is obvious to the Court that [the provision] was purposefully inserted because the legislature knew [the statute] would incite a challenge. This section can only be seen as an unconstitutional effort to forestall and encumber this predictable lawsuit. The legislature may not financially hobble an opponent to protect its enactment."); *see also Coffey v. Cox*, 234 F. Supp. 2d 884, 891 (C.D. Ill. 2002) ("[A]n award of Defendants' attorneys' fees imposed against Plaintiff [under 42 U.S.C. § 1988] may chill a future meritorious plaintiff from pursuing his civil rights action for fear of having to pay his opponent's attorney's fees should he ultimately be unsuccessful.").

91.    For similar reasons, SB 1327 § 2 also violates Plaintiffs' substantive due process rights.

92.    If a legislative classification infringes on a recognized fundamental right, "substantive due process forbids the infringement of that right 'at all, no matter

- 20 -

what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Witt v. Dep't of Air Force*, 527 F.3d 806, 817 (9th Cir. 2008) (citing *Reno v. Flores,* 507 U.S. 292, 301–02 (1993)). Otherwise, courts apply rational basis review. *Id.*

93.     The right to petition the government and the corresponding right to access the courts are fundamental. *Chambers v. Baltimore & Ohio Railroad Co.*, 207 U.S. 142, 148 (1907) (the right to sue and defend in the courts "is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship . . ."); *see also Ryland v. Shapiro*, 708 F.2d 967, 971 (5th Cir. 1983) ("The right of access to the courts is basic to our system of government, and it is well established today that it is one of the fundamental rights protected by the Constitution.").

94.     California's only asserted interests in SB 1327 § 2 were (i) to retaliate against the State of Texas for enacting the Texas Heartbeat Act and (ii) to deter meritorious challenges to anti-gun rights legislation. These are not legitimate governmental interests—let alone compelling ones.

95.     Nor is SB 1327 § 2 narrowly tailored because, among other things, it (1) makes litigants, attorneys, *and* law firms jointly and severally liable for attorneys' fees and costs; and (2) provides for an award of fees to the government in any challenge to a California firearm regulation—including challenges where the plaintiff prevails on some or nearly all of its claims.

96.     Thus, SB 1327 § 2 would not pass strict scrutiny or rational basis review.

97.     Because SB 1327 § 2 violates Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution, Plaintiffs are entitled to declaratory and preliminary and permanent injunctive relief.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**Third Claim for Relief**
**(42 U.S.C. § 1983 Action for Deprivation of Plaintiffs' Right to**
**Equal Protection under U.S. Const. amend. XIV)**

98.   Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

99.   The Fourteenth Amendment, enforceable under 42 U.S.C. § 1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.

100.   Equal protection is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Living Ctr.*, 473 U.S. 432, 439 (1985).

101.   If unequal treatment occurs in the context of exercising a fundamental right, or the government is motivated by animus toward a disfavored group, courts apply heighted scrutiny.  *See Loving v. Virginia*, 388 U.S. 1, 11 (1967); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996); *City of Cleburne*, 473 U.S. at 439.

102.   Both the right to petition the government and the right to keep and bear arms are fundamental rights.

103.   On its face, SB 1327 § 2 does not apply to plaintiffs who bring constitutional challenges against non-gun-related regulations. SB 1327 § 2 therefore unequally denies Plaintiffs their fundamental right to petition the government for asserting a particular constitutional right—the right to bear and keep arms—while placing no similar burden on challenges asserting other constitutional rights.

104.   Again, California's only asserted interests in SB 1327 § 2 were (i) to retaliate against the State of Texas for enacting the Texas Heartbeat Act and (ii) to deter meritorious challenges to anti-gun rights legislation. These are not legitimate governmental interests—let alone compelling ones.

105.   Nor is SB 1327 § 2 narrowly tailored for the reasons explained in Plaintiffs' Second Claim for Relief, *supra*.

106.    Thus, SB 1327 § 2 would not pass strict scrutiny or rational basis review.

107.    Because SB 1327 § 2 deprives Plaintiffs of the right to equal protection under the law secured by the Fourteenth Amendment of the United States Constitution, Plaintiffs are entitled to declaratory and preliminary and permanent injunctive relief.

### Fourth Claim for Relief
### (Supremacy Clause, U.S. Const. art. VI)

108.    Plaintiffs incorporate the foregoing allegations as though fully set forth herein.

109.    SB 1327 § 2 impedes the vindication of federal rights, and is therefore preempted by 42 U.S.C. § 1988(b), which permits the court to give the "prevailing party [in a § 1983 action] . . . a reasonable attorney's fee as part of the costs." *See also Felder v. Casey*, 487 U.S. 131, 138 (1988) (state statute preempted when it "conflicts in both its purpose and effects with the remedial objectives of § 1983"); *La Raza Unida v. Volpe*, 545 F. Supp. 36, 39 (N.D. Cal. 1982) (finding that § 1988 preempted conflicting state law requiring legislative appropriation before the California state defendants would satisfy a judgment).

110.    Because SB 1327 § 2 is preempted by 42 U.S.C. § 1988, Plaintiffs are entitled to declaratory and preliminary and permanent injunctive relief.

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that the Court enter an order and judgment:

A.     Declaring that Cal. Penal Code §§ 29180(f), 29185, 30400, 27530(a), and 18010(d) violate the Second and Fourteenth Amendments and are thus devoid of any legal force or effect;

B.     Permanently and preliminarily enjoining Defendants and their employees and agents from bringing an enforcement action against any company or individual pursuant to Cal. Penal Code §§ 29180, 29185, or 18010(d);

C.     Declaring that SB 1327 § 2 violates the First and Fourteenth Amendments and is thus devoid of any legal force or effect;

D.     Declaring that SB 1327 § 2 violates the Supremacy Clause and is thus devoid of any legal force or effect

E.     Permanently and preliminarily enjoining Defendants and their employees and agents from seeking attorneys' fees pursuant to SB 1327 § 2;

F.     Awarding Plaintiffs their attorneys' fees and costs under 42 U.S.C. § 1988; and

G.     Granting such other and further relief that the Court may deem just and proper.

DATED this 31st day of August, 2022.

SNELL & WILMER L.L.P.

By: /s/ Brett W. Johnson
Brett W. Johnson
Michael Reynolds
Derek C. Flint
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
Attorneys for Plaintiffs