1　Michael Reynolds (CA#174534)
　　Brett W. Johnson (CA#205988)
2　Cameron J. Schlagel (CA#320732)
　　SNELL & WILMER L.L.P.
3　600 Anton Boulevard, Suite 1400
　　Costa Mesa, California  92626-7689
4　Telephone:　(714) 427-7000
　　Facsimile:　(714) 427-7799
5　E-Mail:　　mreynolds@swlaw.com
　　　　　　　bwjohnson@swlaw.com
6　　　　　　　cschlagel@swlaw.com

7　*Attorneys for Plaintiff*

8

9　　　　　　UNITED STATES DISTRICT COURT

10　　　　FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| DEFENSE DISTRIBUTED, a Texas corporation,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ROBERT BONTA, in his official capacity as California Attorney General; LUIS LOPEZ, in his official capacity as Director of the California Bureau of Firearms,<br><br>　　　　Defendant. | Case No. 2:22-cv-06200-GW-AGR<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　October 24, 2022<br>Time:　8:30 a.m.<br>Ctrm.:　9D |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

　　**PLEASE TAKE NOTICE** that Plaintiff Defense Distributed ("Plaintiff") respectfully submits this Motion for Preliminary Injunction against Defendants Robert Bonta and Luis Lopez ("Defendants").

　　During the 2022 legislative session, California passed Assembly Bill 1621, a comprehensive statutory regime that effectively bans the lawful self-manufacture of firearms by, among other things, prohibiting the sale of the tools and parts necessary

Snell & Wilmer
L.L.P.
law offices
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202

to complete the self-manufacturing process. However, under the recent landmark decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the United States Supreme Court abrogated the interest balancing test adopted by the lower courts and held instead that Second Amendment claims must be reviewed in accordance with the Second Amendment's "text and history." 142 S.Ct. at 2129. Under the *Bruen* framework, Plaintiff seeks a preliminary injunction against Penal Code sections 29180(f), 29185, 30400, 27530(a), and 18010(d), as enacted by AB 1621 (collectively, "AB 1621"), on the grounds that these provisions violate the Second Amendment because the right to lawfully self-manufacture firearms is an integral part of our Nation's history and tradition.

Additionally, California enacted Senate Bill 1327, Section 2 of which ("SB 1327") creates an independent cause of action by the State of California against almost any plaintiff that challenges the constitutionality of any California firearms regulation. Thus, Plaintiff also seeks a preliminary injunction against this law because it violates the First Amendment right to petition the government for a redress of grievances, the Fourteenth Amendment Due Process Clause, and the Equal Protection Clause. Additionally, SB 1327's penalty is preempted by 42 U.S.C. section1988. Without a preliminary injunction, Plaintiffs will be irreparably harmed by these multiple, ongoing violations of their constitutional rights.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently-filed Request for Judicial Notice and [Proposed] Order, the pleadings and papers on file in this action, and such further evidence and argument as the Court may properly receive.

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  September 23, 2022

SNELL & WILMER L.L.P.

By: _____
Michael Reynolds
Brett W. Johnson
Cameron J. Schlagel

Attorneys for Plaintiff
Defense Distributed

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................9

II.     FACTUAL BACKGROUND ................................................................10

        A.    CNC Milling Machines and the Ghost Gunner Product. .....................10

        B.    California Passes AB 1621 to Prohibit the Self-
              Manufacture of Firearms. ..............................................................11

        C.    SB 1327 Is Enacted to Restrict Access to the Courts and
              Deter Constitutional Challenges to Firearms Restrictions.................15

III.    STANDARD FOR PRELIMINARY INJUNCTIONS..............................17

IV.     PLAINTIFF WILL SUCCEED ON THE MERITS ...............................18

        A.    AB 1621 Violates the Second and Fourteenth
              Amendments. ...............................................................................19

              1.    The *Bruen* Test. ...............................................................19

              2.    There Are No Historically Analogous Regulations
                    of Self-Made Arms. ...........................................................20

        B.    SB 1327 Violates the First and Fourteenth Amendments
              and is Preempted by Federal Civil Rights Legislation. ...................25

              1.    SB 1327 Violates the First Amendment Right to
                    Petition the Government for a Redress of
                    Grievances. ......................................................................25

              2.    SB 1327 Violates Plaintiff's Substantive Due
                    Process Rights. .................................................................26

              3.    SB 1327 Violates the Fourteenth Amendment Right
                    to Equal Protection. ..........................................................27

              4.    SB 1327 Violates the Supremacy Clause and Is
                    Preempted by Federal Civil Rights Laws. .............................28

V.      PLAINTIFF WILL SUFFER IRREPARABLE HARM...........................29

VI.     THE BALANCE OF HARDSHIPS STRONGLY FAVORS
        PLAINTIFF ......................................................................................30

VII.    AN INJUNCTION IS IN THE PUBLIC INTEREST .............................31

VIII.   CONCLUSION ..................................................................................31

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. C.L. Union of Illinois v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012) ............................................................................31

*Andrews v. State*,
    50 Tenn. 165 (1871) ...........................................................................................19

*Borough of Duryea, Pa. v. Guarnieri*,
    564 U.S. 379 (2011) ............................................................................................25

*Chalk v. U.S. Dist. Ct. Cent. Dist. of California*,
    840 F.2d 701 (9th Cir. 1998) ............................................................................18

*Chambers v. Baltimore & Ohio Railroad Co.*,
    207 U.S. 142 (1907) ............................................................................................27

*City of Cleburne v. Living Ctr.*,
    473 U.S. 432 (1985) ............................................................................................28

*Coffey v. Cox*,
    234 F. Supp. 2d 884 (C.D. Ill. 2002) ..............................................................26

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017) ............................................................................18

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ............................................................................................20

*Elrod v. Burns*,
    (1976) 427 U.S. 347 .............................................................................................29

*Ezell v. City of Chicago*,
    651 F.3d 684 ...............................................................................................19, 30

*Felder v. Casey*,
    487 U.S. 131 (1988) ............................................................................................29

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ............................................................................18

*Garrett v. City of Escondido*,
    465 F. Supp. 2d 1043 (S.D. Cal. 2006) ..........................................................29

*Gilder v. PGA Tour, Inc.*,
    936 F.2d 417 (9th Cir. 1991) ............................................................................18

*Harrison v. Springdale Water & Sewer Comm'n*,
    780 F.2d 1422 (8th Cir. 1986) ..........................................................................25

*Haynes v. Office of the Att'y Gen. Phill Kline*,
    298 F. Supp. 2d 1154 (D. Kan. Oct. 26, 2004) .....................................30, 31

*Ill. Ass'n of Firearms Retailers v. City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ..............................................................19

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

3

4

*In re Workers Comp. Refund*,
 842 F. Supp. 1211 (D. Minn. 1994) ....................................................26

*Johnson v. California State Bd. of Accountancy*,
 72 F.3d 1427 (9th Cir. 1995) ............................................................19

*Klein v. City of San Clemente*,
 584 F.3d 1196 (9th Cir. 2009) ..........................................................30

*La Raza Unida v. Volpe*,
 545 F. Supp. 36 (N.D. Cal. 1982) .....................................................29

*Loving v. Virginia*,
 388 U.S. 1 (1967)...............................................................................28

*McDonald v. City of Chicago, Ill.*,
 561 U.S. 742 (2010)...........................................................................30

*Melendres v. Arpaio*,
 695 F.3d 990 (9th Cir. 2012) ............................................................29

*Monterey Mech. Co. v. Wilson*,
 125 F.3d 702 (9th Cir. 1997) ............................................................30

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 142 S. Ct. 2111 (2022).................................................................passim

*Perfect 10, Inc. v. Amazon.com, Inc.*,
 508 F.3d 1146 (9th Cir. 2007) ..........................................................18

*Preminger v. Principi*,
 422 F.3d 815 (9th Cir. 2005) ............................................................31

*Reno v. Flores*,
 507 U.S. 292 (1993)...........................................................................27

*Richmond Newspapers v. Virginia*,
 448 U.S. 555 (1980)...........................................................................20

*Rodriguez v. Robbins*,
 715 F.3d 1127 (9th Cir. 2013) ..........................................................31

*Romer v. Evans*,
 517 U.S. 620 (1996)...........................................................................28

*Ryland v. Shapiro*,
 708 F.2d 967 (5th Cir. 1983) ............................................................27

*Stormans, Inc. v. Stelecky*,
 586 F.3d 1109 (9th Cir. 2009) ..........................................................30

*the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011) ....................................................18, 30

*United States v. Jackson*,
 390 U.S. 570 (1968)...........................................................................25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3    *Valle del Sol Inc. v. Whiting*,

4      732 F.3d 1006 (9th Cir. 2013) ........................................................31

   *Winter v. Nat. Res. Def. Council, Inc.*,

5      555 U.S. 7 (2008)......................................................18, 21, 22

6    *Witt v. Dep't of Air Force*,

     527 F.3d 806 (9th Cir. 2008) ........................................................27

7    *Wyatt v. Cole*,

8      504 U.S. 158 (1992)......................................................28

   *Zepeda v. U.S. Immigration.*,

9      753 F.2d 719 (9th Cir. 1983) ........................................................30

10

**STATUTES**

11

   18 U.S.C. § 921........................................................13

12    18 U.S.C. § 921(a)(3)........................................................14

13    42 U.S.C. § 1988........................................................29

   42 U.S.C. § 1988(b)........................................................28

14    42 U.S.C. section 1983 ........................................................28, 29

15    Code Civ. Proc. § 1021.11........................................................15

   Pen. Code § 18010(d)........................................................24, 25

16    Pen. Code § 27530(a)........................................................24, 25

17    Pen. Code § 29180........................................................24

   Pen. Code § 29180(f)........................................................24

18    Pen. Code § 29185........................................................24

19    Pen. Code § 29185(a)–(c)........................................................13

   Pen. Code § 29185(b)–(c), (f)........................................................24

20    Pen. Code § 29185(d)(3)(A)–(E)........................................................13

21    Pen. Code § 30400........................................................25

   Pen. Code § 30400(a)........................................................13, 24

22    Pen. Code § 30400(b)........................................................15, 16

23    Pen. Code 29185(d)........................................................13

   Penal Code Sections 29180(f), 29185, 30400, 27530(a), and 18010(d) ...........10, 12

24    Section 18010(d)(1)........................................................15

25    Section 27530(a)........................................................15

   Section 29185 ........................................................12, 13

26    Section 30400 ........................................................13, 15

   U.S. Const. amend. I........................................................25

27    U.S. Const. amend. II........................................................19

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

## REGULATIONS

27 C.F.R. §§ 478.11, 479.11 ................................................................................14

*Definition of "Frame or Receiver" and Identification* of Firearms,
    87 Fed. Reg. 24652 (Apr. 26, 2022) .......................................................14

## OTHER AUTHORITIES

11A FED. PRAC. & PROC. CIV. § 2948.1 (3D ED.) .....................................................29

2022 ..........................................................................................................................15

A.B. 857 ...................................................................................................................24

AB 1621 ............................................................................................................passim

Assembly Bill 1621 ............................................................................................9, 10

*Does the Second Amendment Protect Firearms Commerce?,*
    127 HARV. L. REV. F. 230 (2014) .....................................................22, 23

SB 1327 ............................................................................................................passim

SB 8 ..........................................................................................................................16

Senate Bill 1327 .......................................................................................................9

Snell & Wilmer
L.L.P.
law offices
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## <u>INTRODUCTION</u>

In response to the United States Supreme Court's landmark decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), California enacted a slew of unconstitutional restrictions on the Second Amendment rights of law-abiding Californians. One such piece of legislation is Assembly Bill 1621, which all but eliminates law-abiding citizens' Second Amendment right to craft and build their own personal firearms.

These restrictions are historically unprecedented. Indeed, there is an extensive history and tradition of self-manufactured firearms in the United States, which reveals that self-manufacture has largely been unregulated over the course of our nation's history. What's more, there is no question that self-manufactured firearms are common throughout the United States. Under *Bruen*, these indisputable facts are fatal to AB 1621.

Worse, California has coupled its attempt to suffocate Californians' Second Amendment rights with a blatantly unconstitutional law expressly designed to punish litigants and attorneys who exercise their First Amendment right to challenge gun-control legislation. Specifically, SB 1327 creates a government-only cause of action against any party or attorney who seeks to enjoin a California firearm regulation irrespective of the constitutionality of the challenged restriction or of SB 1327 itself. Why? Two reasons: (1) to discourage constitutional challenges to newly-enacted, draconian anti-gun laws, and (2) to retaliate against the State of Texas for restricting abortion rights. Indeed, California explicitly copied the framework of a Texas abortion law and applied it to Second Amendment challenges. It is difficult to imagine a more flagrant violation of the First and Fourteenth Amendment right of access to the Courts.

1   For these reasons, Plaintiff will succeed on the merits of its challenges to these

2   plainly unconstitutional laws. And the longer these laws remain, the greater the

3   irreparable, constitutional harm Plaintiff and others similarly situated will suffer.

4   Accordingly, Plaintiff respectfully requests that the Court enter a preliminary

5   injunction against AB 1621 and SB 1327.

6

7   **II.**

8   **FACTUAL BACKGROUND**

9   **A.    CNC Milling Machines and the Ghost Gunner Product.**

10   Computer Numerical Control ("CNC") milling machines are the modern-day

11   manifestation of firearm milling technology, a technology that has never before been

12   regulated in American history. Firearm milling technology dates back to the early

13   nineteenth century. *See, e.g.*, Lindsay Schakenbach Regele, *Industrial Manifest*

14   *Destiny: American Firearms Manufacturing and Antebellum Expansion*, 92 BUS.

15   HIST. REV. 57, 64 (2018) (explaining that "[f]ederal support of small arms

16   manufacturing has been well documented," and that federal funds supported the

17   development of the first firearm milling machine in the 1810s). The earliest known

18   milling machine originated at a factory operated by Simeon North, who had a contract

19   with the War Department to manufacture firearms. David A. Hounshell, *From the*

20   *American System to Mass Production, 1800-1932* 28–29 (1984). Beginning in 1820,

21   John H. Hall improved upon North's milling machine, "develop[ing] three classes of

22   milling machines, which he used to finish [firearm] parts." *Id.* at 39–41. Building on

23   these innovations, John T. Parsons invented the first numerical control milling

24   machine in the 1940s. Sohaib Jabran et al., *Functional Reverse Engineering of*

25   *Strategic and Non-Strategic Machine Tools* 42 (Wasim Ahmed Khan et. al. eds., 1st

26   ed. 2021).

27   Modern-day CNC milling is a standard machining process that employs

28   rotating cutting tools to precisely remove material from a workpiece to produce a

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR

custom-designed part or product. CNC milling begins with a design of the final component, which is used to generate coded instructions. It then removes material from the workpiece using a series of precise movements along different paths and axes to produce the final design shape. This process can be used with a variety of materials, including plastic, metal, wood, and glass. And it can create products for use in a wide range of industries, including transportation (aerospace and automotive), commercial, electronics, maintenance, medical, and telecommunications.

CNC milling machines are also commonly used to manufacture a wide variety of firearm frames and receivers. The "Ghost Gunner," which is sold by Plaintiff Defense Distributed, is the latest evolution of a general-purpose, programmable CNC milling machine that allows users to manufacture their own personal firearms by finishing incomplete parts, frames, and receivers of some of the most popular firearms in the United States, including the AR-15, AR-308, M1911, and AK-47, which are all commonly used personal firearms in the United States.

Until recently, Defense Distributed sold a variety of precursor firearm parts, including 80%-complete frames and receivers. However, due to current regulations, it no longer does so in California. Nevertheless, it continues to sell the Ghost Gunner in California. Because the *materials* provided by Defense Distributed often do not have serial numbers and may not be required to be licensed by the federal government until the firearm is assembled by the personal owner, they may be used to make what are popularly known as "ghost guns."

**B.    California Passes AB 1621 to Prohibit the Self-Manufacture of Firearms.**

On June 30, 2022, the California Governor signed AB 1621, which amended or added multiple provisions of the Penal Code, including sections 29180(f), 29185, 30400, 27530(a), and 18010(d). AB 1621 was enacted as an "urgency" statute, meaning it took effect immediately. *See* AB 1621 § 41. These provisions, taken

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR

together, effectively ban the self-manufacture of firearms in California.

*First*, Section 29180(f),[1] added by AB 1621 § 22, provides that "[a] person, corporation, or firm shall not knowingly manufacture or assemble, or *knowingly cause, allow, facilitate, aid, or abet the manufacture or assembling of*, a firearm that is not imprinted with a valid state or federal serial number or mark of identification." Cal. Penal Code § 29180(f) (emphasis added). A violation "is punishable by imprisonment in a county jail not to exceed one year, or by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment" if the firearm at issue is a handgun. *See id.* § 29180(g). For all other firearms, a violation "is punishable by imprisonment in a county jail not to exceed six months, or by a fine not to exceed one thousand ($1,000), or by both that fine and imprisonment." *Id.*

*Second*, Section 29185, added by AB 1621 § 25, imposes sweeping restrictions that criminalize the use or sale of CNC milling machines. It provides, in relevant part, that:

    (a)    No person, firm, or corporation, other than a federally licensed firearms manufacturer or importer, shall use a computer numerical control (CNC) milling machine to manufacture a firearm, including a completed frame or receiver or a firearm precursor part[;]

    (b)    It is unlawful to sell, offer to sell, or transfer a CNC milling machine that has the sole or primary function of manufacturing firearms to any person in this state, other than a federally licensed firearms manufacturer or importer[; and]

    (c)    It is unlawful for any person in this state other than a federally licensed firearms manufacturer or importer to possess, purchase, or receive a CNC milling machine that has the sole or primary function of manufacturing firearms.

---

[1] Unless otherwise indicated, all section references are to the California Penal Code.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

1    Cal. Penal Code § 29185(a)–(c).

2            To avoid violating Section 29185, any individual in California who possesses

3    a CNC machine "that has the sole or primary function of manufacturing firearms"

4    before the effective date of AB 1621 (June 30, 2022) must, within 90 days after the

5    effective date, take one of the following actions:

6            (A)    Sell[] or transfer[] the machine to a federally licensed firearms

7                   manufacturer or importer[;]

8            (B)    Sell[] or transfer[] the machine to a person described in

9                   [§ 29185(d)] paragraph (1)[;]

10           (C)    Remove[] the machine from this state[;]

11           (D)    Relinquish[] the machine to a law enforcement agency[; or]

12           (E)    Otherwise lawfully terminate[] possession of the machine.

13   Cal. Penal Code § 29185(d)(3)(A)–(E). For many hobbyists, the question of whether

14   their CNC machine has any "primary" purpose is at best ambiguous.

15           *Third*, Section 30400, added by AB 1621 § 28, criminalizes the sale or transfer

16   of federally unregulated firearm precursor parts. Specifically, the statute makes it

17   "unlawful for a person to purchase, sell, offer to sell, or transfer ownership of any

18   firearm precursor part in this state that is not a federally regulated firearm precursor

19   part." Cal. Penal Code § 30400(a). Section 16519, added by AB 1621 § 5, in turn,

20   defines a "federally regulated firearm precursor part" as "any firearm precursor part

21   deemed to be a firearm pursuant to [18 U.S.C. § 921 *et seq*.] and any regulations

22   issued pursuant thereto, and, if required, *has been imprinted with a serial number* by

23   a federal licensee authorized to serialize firearms in compliance with all applicable

24   federal laws and regulations." *Id.* § 16519 (emphasis added).

25           Under this section, California cynically uses recent changes to the federal

26   definition of "firearm" to support its prohibition of self-manufacturing. In relevant

27   part, the federal definition of a "firearm" includes "the frame or receiver of any such

28   weapon." 18 U.S.C. § 921(a)(3). Before April 22, 2022, ATF regulations defined

- 13 -

"frames" and "receivers" as firearm components that are readily operational without any additional modification. *See* 27 C.F.R. §§ 478.11, 479.11 (eff. until August 24, 2022) (defining a "firearm frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel").

However, on April 22, 2022, ATF issued a so-called "Final Rule" expanding the definition of a "firearm," to include a "partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designated to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652, 24735, 24739 (Apr. 26, 2022) (codified at 27 C.F.R. §§ 478.11 and 478.12) (the "New Rule"). The New Rule took effect on August 24, 2022. *Id.* at 24652. And now that the New Rule is in effect,[2] any precursor parts falling outside the current federal definition of "frame or receiver" (which are therefore not considered "firearms") are not federally regulated or required to have a serial number, and thus do not qualify as "federally regulated precursor parts" under § 16519. Accordingly, the California Department of Justice has taken the position that, since the New Rule took effect, only federally regulated firearm precursor parts—which do not include the unfinished frames or receivers sold by Defense Distributed—may be purchased, sold, offered for sale, or transferred in California, unless a limited exception applies. *See* Cal. Penal Code § 30400(b).

*Fourth*, Section 27530(a), added by AB 1621 § 17, prohibits the sale or transfer of "a firearm that is not imprinted with a serial number imprinted by a federal licensee authorized to serialize firearms." Due to ATF's New Rule expanding the definition of a "firearm," this regulation works in conjunction with Section 30400 to effectively

---

[2] The New Rule has already been subject to challenges.  On September 2, 2022, the United States District Court for the Northern District of Texas issued a preliminary injunction against the ATF prohibiting the enforcement of the New Rule. *See* attached.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

ban the sale, transfer, or import into California of all unfinished frames, receivers, and other precursor parts required to self-manufacture a firearm.

*Finally*, to enforce these new restrictions on the sale, transfer, or import of firearm precursor parts, Section 18010(d)(1), added by AB 1621 § 10, authorizes the Attorney General, a district attorney, or a city attorney to bring an action to "enjoin the importation into the state or sale or transfer of any firearm precursor part that is unlawfully imported into [California] or sold or transferred within" California.

**C.    SB 1327 Is Enacted to Restrict Access to the Courts and Deter Constitutional Challenges to Firearms Restrictions.**

In addition to sweeping new firearms restrictions, California enacted SB 1327 for the express purpose of deterring aggrieved parties from exercising their First Amendment rights to challenge laws restricting their Second Amendment rights. Section 2 of SB 1327, 2022 Cal. Legis. Serv. Ch. 146, enacted on July 22, 2022 and effective January 1, 2023, adds § 1021.11 to the California Code of Civil Procedure, providing that:

> (a) Notwithstanding any other law, any person, including an entity, attorney, *or law firm*, who seeks declaratory or injunctive relief to prevent this state, a political subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or *any other type of law that regulates or restricts firearms*, or that represents any litigant seeking that relief, *is jointly and severally liable to pay the attorney's fees and costs of the prevailing party*.

SB 1327 § 2 (emphasis added).

Under the statute, only the government can be a "prevailing party." *See id.* (expressly excluding plaintiffs or their attorneys from recovering attorneys' fees). Worse, the government is considered the "prevailing party" if a court: (1) "[d]ismisses any claim or cause of action brought by the party seeking the declaratory or injunctive relief described by subdivision (a), *regardless of the reason for the*

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

*dismissal*," or (2) "[e]nters judgment in favor of the party opposing the declaratory or injunctive relief described by subdivision (a), *on any claim or cause of action*." *Id.* (emphasis added).

In other words, any person—including an individual lawyer or law firm representing a client—who seeks to enjoin a California firearm restriction faces liability under SB 1327 for the California government's attorneys' fees even if, for example, the plaintiff prevails on nine out of ten claims, and the tenth claim is dismissed because it is duplicative of relief granted on one of the other claims. *Id.*

It is no secret that California's inclusion of Section 2—and its passage of SB 1327 more generally—was designed to retaliate against the State of Texas for its recently-passed abortion law. The California Senate Judiciary Committee admitted that SB 1327 "is modeled after a controversial Texas abortion law, and includes a number of the same *problematic procedural mechanisms*." *See* California Senate Judiciary Committee Analysis of SB 1327, at 2 (2022) (emphasis added). Likewise, the California Assembly Committee on Judiciary acknowledged that "Texas included a number of provisions in [Texas] SB 8 *to discourage lawsuits challenging the law itself* . . . The mechanism for doing so was to make the party who was not the 'prevailing party' in such a lawsuit responsible for attorney's fees, imposed liability for the fees on both the plaintiff and their attorney, and create lopsided and unfair rules about who was the 'prevailing party' (spoiler alert: almost never the party who challenges the law). *This bill replicates those provisions*." California Assembly Judiciary Committee Analysis of SB 1327, at 12 (2022) (emphasis added). The Assembly Judiciary Committee further commented:

> It's a lose-lose scenario for plaintiffs who challenge the bill or a gun law; and a win-win scenario for the government. An attorney could properly represent a client in seeking to strike down an unconstitutional law, win on all but one count, and break no other statutory or professional duties, but then be held responsible (along with their client) for paying the defendant's attorney's fees. In fact, even if the defendant failed to seek attorney's fees in the underlying

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR

1
2
3
4
5
6

> action or the court refused to award them and found this bill to be unconstitutional, this bill would allow the defendant government entity to bring an action within three years to hold the attorney responsible for those fees and costs. *This language appears to be unprecedented in California law and likely would not be endorsed by this Committee but for the fact that it is included in this bill and modeled on Texas law.*

7   *Id.* at 13 (emphasis added).

8   Astonishingly, the Senate Floor analysis all but concedes that SB 1327 is

9   unconstitutional: "[w]hile the goal of repurposing the Texas law may be sound, these

10   problematic provisions may not justify those ends. They insulate government action

11   from meaningful challenge by creating a strong, punitive deterrent for any that try

12   and in the end, *may violate due process guarantees*." California Senate Floor

13   Analysis of SB 1327, at 7 (2022) (emphasis added). Nevertheless, California's

14   Governor signed SB 1327 into law and confirmed that the bill has no legitimate

15   purpose: "If they [Texas] are going to use this framework to put women's lives at

16   risk, we are going to use it to save people's lives here in the state of California. *That's*

17   *the spirit, the principle, behind this law*."[3]

18

19   **III.**

20   **STANDARD FOR PRELIMINARY INJUNCTIONS**

21   The purpose of a preliminary injunction "is to preserve the *status quo* pending

22   a determination of the action on the merits." *Chalk v. U.S. Dist. Ct. Cent. Dist. of*

23   *California*, 840 F.2d 701, 704 (9th Cir. 1998). A plaintiff is entitled to a preliminary

24   injunction when it establishes that: (1) it is "likely to succeed on the merits"; (2) it is

25   "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the

26

27   _____
     [3] Alex Berke, *California's New Gun Bill Is Bad Law and Dumb Politics*, The Daily Beast (July 29, 2022) (emphasis added), available at
28   https://www.thedailybeast.com/californias-new-gun-bill-is-bad-law-and-dumb-politics.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Ninth Circuit utilizes a sliding scale approach under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, "[a] preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships . . . tips sharply towards' it, as long as the second and third *Winter* factors are satisfied." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). As applied here, all four factors weigh strongly in favor of granting Plaintiff injunctive relief.

## IV.

## PLAINTIFF WILL SUCCEED ON THE MERITS

"Likelihood of success on the merits 'is the most important' *Winter* factor." *Id.* at 856. (citing *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc)). "[O]nce the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007). The merits prong requires only a reasonable probability of success, not an overwhelming likelihood. *See Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991); *Johnson v. California State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995) ("[f]air chance of success on the merits," not certainty or even probability, suffices for preliminary injunction purposes).

Plaintiff is highly likely to succeed on the merits of its claims that AB 1621 and SB 1327 are unconstitutional.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**A.    AB 1621 Violates the Second and Fourteenth Amendments.**

The Second Amendment, which the Fourteenth Amendment incorporates against the States, guarantees "a law-abiding citizen's right to armed self-defense." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022). The text of the Second Amendment, which guarantees "the right of the people to keep and bear Arms," implicitly includes the right to acquire and manufacture firearms. *See* U.S. Const. amend. II. Further, the "right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms." *See Andrews v. State*, 50 Tenn. 165, 178 (1871). Indeed, the Second Amendment's guarantee would mean nothing if it did not protect the acquisition and manufacturing of firearms. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 ("[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930, 930 (N.D. Ill. 2014) ("the right to keep and bear arms for self-defense under the Second Amendment . . . must also include the right to *acquire* a firearm").

1.    The *Bruen* Test.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2129–30. To rebut this presumption, the "government may not simply posit that the regulation promotes an important interest." *Id.* at 2126. Rather, it "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* A firearm regulation falls outside the "Second Amendment's unqualified command" only if it is "consistent with this Nation's historical tradition." *Id.* at 2126, 2130 (cleaned up). Unlike means-end scrutiny, *no judicial deference is owed to legislative interest balancing*—the "Second Amendment 'is the very *product* of an

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR

1    interest balancing by the people.'" *Id.* at 2131 (quoting *District of Columbia v. Heller*,
2    554 U.S. 570, 635 (2008)) (emphasis in original)).

3        Instead, *Bruen's* text and history standard "requires courts to assess whether
4    modern firearm regulations are consistent with the Second Amendment's text and
5    historical understanding." *Id*. "[W]hen a challenged regulation addresses a general
6    societal problem that has persisted since the 18th century, the lack of a distinctly
7    similar historical regulation addressing that problem is relevant evidence that the
8    challenged regulation is inconsistent with the Second Amendment." *Id*. Further, "the
9    Court has acknowledged that certain unarticulated rights are implicit in enumerated
10   guarantees . . . [and] fundamental rights, even though not expressly guaranteed, have
11   been recognized by the Court as indispensable to the enjoyment of rights explicitly
12   defined." *Richmond Newspapers v. Virginia,* 448 U.S. 555, 579–80 (1980).

13       Applying this standard here, the State must establish (1) the challenged
14   regulations share common features with historically analogous regulations from the
15   18th to the mid-19th Centuries; (2) the analogues were prevalent, not historical
16   outliers; and (3) the modern regulation and the historical analogues are ***relevantly***
17   similar, *i.e.*, satisfying the "how and why" factors. *Bruen*, 142 S.Ct. at 2132–33.

18

19       2.   <u>There Are No Historically Analogous Regulations of Self-Made Arms</u>.

20       Although it is the ***government's*** burden, a brief review of history and tradition
21   reveals that self-manufactured firearms have a long and, until recently, unregulated
22   history in the United States. *See, e.g.*, Joseph G. S. Greenlee, *The American Tradition*
23   *of Self-Made Arms*, 54 ST. MARY'S L.J. (forthcoming 2022).[4] The unregulated self-
24   manufacture of firearms was common in the American colonies, beginning with

25

---

26   [4] Manuscript available at:
     https://deliverypdf.ssrn.com/delivery.php?ID=5740841130830070081021200940050
27   2308805008205200604305503009711400600600310608909800002904503205501
     4058032016027075093065001028033070056089028116121026010020093077030
28   0063012064090089088098072124003120021007071126110271171220170770200
     11406400003111102013&EXT=pdf&INDEX=TRUE.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

gunsmiths who made and repaired militia and hunting weapons and were "extremely important and highly valued in their communities." *See id.* at 9. Indeed, colonists had the express right to import firearms and the parts necessary to make them. *Id.* at 9–10 (citing Francis Newton Thorpe, *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America* 3787–88 (Francis Newton Thorpe ed., 1909)). While "[i]n the large gunsmith shops of the cities it is probable that many minds were given to the making of a gun . . . in the smaller shops which formed the great majority—mere cabins on the outskirts of the wilderness—one man with or without an apprentice did every part of the work." Charles Winthrop Sawyer, *Firearms in American History* 145 (1910); *see also* James B. Whisker, *The Gunsmith's Trade* 5 (1992) ("In small shops one tradesman performed all operations required to make a gun . . . There was no division of labor."). Accordingly, colonial law reflected this understanding that the right to bear arms extended to commerce in firearms, which is necessarily associated with their manufacture. For instance, in Virginia, all persons had "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." Laws of Va., Feb. 1676-77, Va. Stat. at Large, 2 Hening 403 (1823).

During the Revolutionary War, when the British attempted to prevent the Americans from acquiring firearms and ammunition, Americans were forced to manufacture their own firearms and gunpowder to survive. *See* Greenlee, *supra*, at 12–15 (citing M.L. Brown, *Firearms in Colonial America: The Impact on History and Technology 1492-1792* 127 (1980)). Due to the circumstances of the war, "[n]early every able-bodied male between 16 and 60 . . . [had] to provide his own arms" and some men "built their arms themselves." *Id.* at 25. Further, "[w]hen the colonies faced major arms shortages throughout the war, domestic arms manufacturing filled the void." *Id.* at 16; *see also* David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 HARV. L. REV. F. 230, 234 (2014)

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

("the right to engage in firearms commerce . . . is one of the most important reasons why America's political dispute with Great Britain turned into an armed revolution"). Indeed, several colonies solicited firearm manufacturers, including those engaged in private manufacture and others outside of the firearms industry, to increase domestic production. *See* Greenlee, *supra*, at 18–23.

Describing the landscape of firearms in early America in 1793, Thomas Jefferson wrote that "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States George Hammond, May 15, 1793, *in* 7 *The Writings of Thomas Jefferson* 325–26 (Paul Ford ed., 1904). Indeed, after the Revolutionary War, "[b]ecause gunsmithing was a universal need in early America, many early Americans who were professionals in other occupations engaged in gunsmithing as an additional occupation or hobby." Greenlee, *supra*, at 29. Specifically, "persons occupied as blacksmiths, whitesmiths, tinsmiths, locksmiths, silversmiths, farmers, clock and watchmakers, carpenters, mechanics, cutlers, stonemasons, merchants, and at least one attorney offered gunsmithing services." *Id.* at 29–31. This tradition extended to pioneers, mountain men, and explorers whose need to make and repair firearms was a necessity to survive. *Id.* at 32. Moreover, although some early riflemakers forged their firearm parts from scratch, "there were gunsmiths who did not forge out their barrel blanks, but purchased them in bulk from some factory like that of Eliphalet Remington." John G.W. Dillin, *The Kentucky Rifle* 96 (1975). These riflemakers then fitted their barrels "to hand-made stocks with American factory or English locks." *Id.* The "precursor parts" of their day.

This tradition continued into the nineteenth and twentieth centuries, where "[m]any of the most important innovations in firearms technology began not in a federal armory or major firearms manufactory, but in private homes and workshops." Greenlee, *supra*, at 35. Such innovations include "[t]he most popular rifle in America

today . . . the AR-15, owned in the tens of millions . . . [whose] roots are in homebuilding." *Id*. at 39. To be sure, anyone with the requisite skill could build firearms for any purpose; "[o]ne need not have had a wealthy patron or sponsor, or work for king and nobility, to make guns." *Id.* at 41 (internal citation omitted); Whisker, *supra*, at 6 ("Even those apprentices who had never completed an apprenticeship might enter the trade. No guild, union or government agency attempted to regulate the gun making business . . . He need not take any examination. He need not present one of his guns to any examining board."); *id.* at 90 ("Gunsmiths considered it to be their right to make guns without regulation or interference.").

In fact, *no restrictions* were placed on the self-manufacture of firearms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. *See* Greenlee, *supra*, at 40. Rather, "*[a]ll such restrictions have been enacted within the last decade*." *Id.* (emphasis added). The first major federal gun regulation was not enacted until the 1934 National Firearms Act. And it narrowly regulated only "a subset of arms thought particularly suitable for criminal use." Jake Charles, *Ghost Guns, History, and the Second Amendment*, DUKE CENTER FOR FIREARMS LAW (Apr. 27, 2022), https://firearmslaw.duke.edu/2022/04/ghost-guns-history-and-the-second-amendment/. But the federal government has never required a license to build a firearm for personal use. *See* Greenlee, *supra*, at 42. Instead, restrictions applying to self-manufactured firearms generally apply to all firearms—for instance, "the making of a firearm that falls within the scope of the National Firearms Act requires advanced approval by [ATF], as well as a tax payment. But no federal law uniquely targets arms built for personal use." *Id.* at 42–43.

Despite these laws—all of which were enacted long after the Founding and the passage of the Fourteenth Amendment—it has always been lawful to build arms for personal use under federal law with no special restrictions. *See What is ATF Doing in Regards to People Making Their Own Firearms*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (May 14, 2015), https://www.atf.gov/firearms/qa/what-

1  atf-doing-regards-people-making-their-own-firearms (last visited August 4, 2022)

2  ("An individual may generally make a firearm for personal use.").

3        At the state level, it was not until 2016 that a small minority of states began to

4  regulate the manufacture of arms for personal use. *See* Greenlee, *supra*, at 42.

5  California was the first, passing a law in 2016 that took effect in 2018. *See* 2016 Cal.

6  Legis. Serv. Ch. 60 (A.B. 857) (adding Cal. Penal Code § 29180). A handful of other

7  states followed suit (including New Jersey, Connecticut, Hawaii, the District of

8  Colombia, Rhode Island, and Nevada), but only California has completely banned

9  self-manufacturing processes for firearms.

10        In sum, there is no historical tradition in the United States of regulating, let

11  alone prohibiting, the self-manufacture of firearms and the tools and parts needed to

12  do so. By doing just that, California's newly-enacted, draconian restrictions violate

13  the Second Amendment. *See Bruen*, 142 S. Ct. at 2130; Cal. Penal Code §§ 29180(f),

14  29185, 30400(a), 27530(a), and 18010(d).

15        For instance, section 29185 prohibits *any* private person or company (except a

16  "federally licensed firearms manufacturer or importer") from using CNC milling

17  machines to manufacture their own weapons. Even the mere sale, offer to sell,

18  transfer, possession, purchase, or receipt of this technology subjects an individual to

19  criminal liability. *See* Cal. Penal Code § 29185(b)–(c), (f).

20        Section 29180(f) similarly prohibits any person or company from

21  manufacturing or "caus[ing], allow[ing], facilitat[ing], or abet[ting] the manufacture

22  of" firearms—a prohibition that appears to apply broadly to companies that sell CNC

23  milling machines. And Sections 30400, 27530(a), and 18010(d) all but prohibit

24  citizens from acquiring the precursor materials needed to self-manufacture modern,

25  commonly used firearms.

26        Put simply, these unprecedented regulations are plainly inconsistent with the

27  "Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  They

28  violate Plaintiff's Second and Fourteenth Amendment rights and Plaintiff will

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR

succeed on the merits of these claims.

**B.      SB 1327 Violates the First and Fourteenth Amendments and is Preempted by Federal Civil Rights Legislation.**

SB 1327 blatantly and unconstitutionally seeks to curtail litigants from vindicating their constitutional rights under the Second Amendment. It is plainly invalid for at least four reasons.

1.      SB 1327 Violates the First Amendment Right to Petition the Government for a Redress of Grievances.

The First Amendment, which the Fourteenth Amendment incorporates against the States, provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The right of access to the courts is fundamental to the right of petition. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011). It "cannot be impaired, either directly . . . or indirectly, by threatening or harassing [an individual] in retaliation for filing lawsuits," and "state officials may not take retaliatory action against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future." *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1427–28 (8th Cir. 1986); *see also United States v. Jackson*, 390 U.S. 570, 582 (1968) ("Whatever might be said of Congress' objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights.").

Applying these principles, courts have consistently invalidated attorney fee provisions that chill litigants' willingness to vindicate their constitutional rights. *See In re Workers Comp. Refund*, 842 F. Supp. 1211, 1218–19 (D. Minn. 1994), *aff'd sub nom In re Workers' Comp. Refund*, 46 F.3d 813 (8th Cir. 1995) (finding that a similar fee shifting provision unconstitutional because "[i]t is obvious to the Court that [the

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

provision] was purposefully inserted because the legislature knew [the statute] would incite a challenge. This section can only be seen as an unconstitutional effort to forestall and encumber this predictable lawsuit. The legislature may not financially hobble an opponent to protect its enactment."); *see also Coffey v. Cox*, 234 F. Supp. 2d 884, 891 (C.D. Ill. 2002) ("[A]n award of Defendants' attorneys' fees imposed against Plaintiff [under section 1988] may chill a future meritorious plaintiff from pursuing his civil rights action for fear of having to pay his opponent's attorney's fees should he ultimately be unsuccessful.").

Likewise, SB 1327's attorney fee cause of action is plainly intended to chill challenges to unconstitutional legislation. It imposes liability upon anyone who challenges California's litany of restrictions on their Second Amendment rights—including attorneys and law firms. Under this provision, an attorney could represent a client seeking to strike down an unconstitutional law, win on all but one claim, and still be held responsible for paying the government's attorney's fees. In fact, even if the defendant fails to seek attorney's fees in the underlying action or the court refuses to award them and *finds this provision unconstitutional*, this bill allows the defendant to bring an action within three years to hold the attorney responsible for those fees and costs. There is no question that this violates the First Amendment right to petition the government for a redress of grievances. *See In re Workers Comp. Refund*, 842 F. Supp. at 1218–19.

2.    <u>SB 1327 Violates Plaintiff's Substantive Due Process Rights</u>.

If a legislative classification infringes on a fundamental right, "substantive due process forbids the infringement of that right 'at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Witt v. Dep't of Air Force*, 527 F.3d 806, 817 (9th Cir. 2008) (citing *Reno v. Flores,* 507 U.S. 292, 301–02 (1993)). The right to petition the government and the corresponding right to access the courts are fundamental rights

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

and, therefore, SB 1327 must be narrowly tailored to achieve a compelling state interest. *Chambers v. Baltimore & Ohio Railroad Co.*, 207 U.S. 142, 148 (1907) (the right to sue and defend in the courts "is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship . . ."); *see also Ryland v. Shapiro*, 708 F.2d 967, 971 (5th Cir. 1983) ("The right of access to the courts is basic to our system of government, and it is well established today that it is one of the fundamental rights protected by the Constitution.").

SB 1327 violates Plaintiff's substantive due process rights. California's only asserted interests in SB 1327 were (i) to retaliate against the State of Texas by copying procedural mechanisms included within the Texas Heartbeat Act and (ii) to deter legitimate Second Amendment challenges to California's byzantine firearm regulations. These are not legitimate governmental interests—let alone compelling ones. Nor is SB 1327 narrowly tailored because, among other things, it (i) makes litigants, attorneys, *and* law firms jointly and severally liable for attorneys' fees and costs, and (ii) provides for an award of fees to the government in any challenge to a California firearm regulation—including challenges where the plaintiffs prevail on nearly all of their claims. Thus, because SB 1327 cannot pass strict scrutiny (or even rational basis review), Plaintiff is highly likely to establish a due process violation on the merits.

3.      SB 1327 Violates the Fourteenth Amendment Right to Equal Protection.

The Fourteenth Amendment, enforceable under 42 U.S.C. section 1983, provides that no State shall deny to any person within its jurisdiction the equal protection of the laws. Equal protection is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Living Ctr.*, 473 U.S. 432, 439 (1985). If unequal treatment occurs in the context of exercising a

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

fundamental right, or the government is motivated by animus toward a disfavored group, courts apply heighted scrutiny. *See Loving v. Virginia*, 388 U.S. 1, 11 (1967); *Romer v. Evans*, 517 U.S. 620, 632 (1996); *City of Cleburne*, 473 U.S. at 439.

Both the right to petition the government and the right to keep and bear arms are fundamental rights. On its face, SB 1327 does not apply to a similarly situated class of plaintiffs who bring constitutional challenges against non-gun-related regulations. Section 2 therefore unequally denies Plaintiff its fundamental right to petition the government for asserting a particular constitutional right—the right to keep and bear arms—while placing no similar burden on challenges asserting other constitutional rights. Again, because California's only asserted interests in SB 1327 are illegitimate (i.e., deterring citizens from seeking to vindicate their constitutional rights and retaliating against Texas), Plaintiff is highly likely to establish an equal protection violation on the merits.

4.   SB 1327 Violates the Supremacy Clause and Is Preempted by Federal Civil Rights Laws.

Because SB 1327 also impedes the vindication of federal rights, it is preempted by federal law. The purpose of 42 U.S.C. section 1983 is to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). To further this purpose, 42 U.S.C. section 1988(b) authorizes the courts to award the "prevailing party [in a section 1983 action] . . . a reasonable attorney's fee as part of the costs." *See also Felder v. Casey*, 487 U.S. 131, 138 (1988) (state statute preempted when it "conflicts in both its purpose and effects with the remedial objectives of § 1983"); *La Raza Unida v. Volpe*, 545 F. Supp. 36, 39 (N.D. Cal. 1982) (section 1988 preempted conflicting state law requiring legislative appropriation before State defendants could satisfy a judgment).

Here, the penalty provision in SB 1327 directly conflicts with this purpose because it shifts the entire cost of Second Amendment litigation to a successful plaintiff *and their attorneys*, even if the court finds the challenged firearms regulation, like AB 1621, blatantly unconstitutional. The attorney's fees provision in Section 2—especially its one-sided limitation and definition of "prevailing party"—directly conflicts with the purpose of 42 U.S.C. § 1988 to *encourage* constitutional litigation by awarding a prevailing plaintiff their attorney's fees. Therefore, SB 1327 is preempted by 42 U.S.C. section 1988, and Plaintiffs are highly likely to establish that the statute violates the Supremacy Clause.

## V.

## PLAINTIFF WILL SUFFER IRREPARABLE HARM

To obtain injunctive relief, Plaintiffs must "establish[] a threatened and imminent irreparable harm that cannot be adequately compensated at a later time," so as to warrant injunctive relief. *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1052 (S.D. Cal. 2006). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, (1976) 427 U.S. 347, 373); § 2948.1 GROUNDS FOR GRANTING OR DENYING A PRELIMINARY INJUNCTION—IRREPARABLE HARM, 11A FED. PRAC. & PROC. CIV. § 2948.1 (3D ED.) ("When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary."). This is because "constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Stormans, Inc. v. Stelecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quotation marks omitted).

Further, the Ninth Circuit has often imported the First Amendment's "irreparable-if-only-for-a-minute" concept to cases involving other rights and, in doing so, has held a deprivation of these rights constitutes irreparable harm *per*

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR

*se. See Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). The Second Amendment should be treated no differently. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010); *Ezell*, 651 F.3d at 700 (a deprivation of the right to keep and bear arms is "irreparable and having no adequate remedy at law").

Here, in the absence of injunctive relief, Plaintiff will continue to be deprived of their Second and Fourteenth Amendment rights by the regulatory scheme set forth in AB 1621. Additionally, SB 1327 is currently depriving Plaintiff of its First Amendment rights by threatening to impose liability on Plaintiff *and* its attorneys for seeking to vindicate constitutional rights. Accordingly, Plaintiff satisfies the second prong of *Winter*.

## VI.

## THE BALANCE OF HARDSHIPS STRONGLY FAVORS PLAINTIFF

Under the third *Winter* factor, courts consider "the balance of hardships between the parties." *All. for the Wild Rockies*, 632 F.3d at 1137. For challenges to government action that affects the exercise of constitutional rights, "[t]he public interest . . . tip[s] sharply in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). And the State "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Haynes v. Office of the Att'y Gen. Phill Kline*, 298 F. Supp. 2d 1154, 1160 (D. Kan. Oct. 26, 2004) (citing *Zepeda v. U.S. Immigration.*, 753 F.2d 719, 727 (9th Cir. 1983)). Further, the State "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("It is clear that it would not be equitable . . . to allow the state to violate the requirements of federal law.") (citations omitted).

Here, the balance of harms tips sharply in Plaintiff's favor. An injunction

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

would not harm Defendants, whereas the absence of an injunction would result in further infringement of Plaintiff's constitutional rights. As discussed, Plaintiff is facing the irreparable violation of its constitutional rights. On the other side of the scale, Defendants will not be harmed whatsoever by "being enjoined from constitutional violations." *See Haynes*, 298 F. Supp. 2d at 1160. Thus, the balance of equities and the public interest favor granting Plaintiff's preliminary injunction.

## VII.

## AN INJUNCTION IS IN THE PUBLIC INTEREST

It is well-established that enforcement of an unconstitutional law is against the public interest. *See e.g.*, *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005); *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012). For the reasons explained above, AB 1621 and SB 1327 are unconstitutional. Thus, the public-interest factor tips sharply in Plaintiff's favor.

## VIII.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that a preliminary injunction be entered enjoining enforcement of AB 1621 and SB 1327. Plaintiff further requests such other and additional relief as the Court deems just and proper.

Dated:  September 23, 2022            SNELL & WILMER L.L.P.


By: _____
      Michael Reynolds
      Brett W. Johnson
      Cameron J. Schlagel

      Attorneys for Plaintiff
      Defense Distributed

4881-4535-8389

MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:22-CV-06200-GW-AGR